**IN THE UNITED STATES DISTRICT COURT, DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| **AMY TROUT,** : | |
| 141 West High Street : | |
| Hancock, MD 21750 : | |
| : | |
| and : | |
| : | |
| **TIMOTHY TROUT,** : | |
| 141 West High Street : | |
| Hancock, MD 21750 : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| v. : | **Case No.** _____ |
| : | |
| **KARL P. RIGGLE, M.D.,** : | |
| 12346 Johnstons Lane : | |
| Mercersburg, PA 17326 : | |
| : | |
| and : | |
| : | |
| **TRISTATE SURGEONS, LLC,** : | |
| Serve: Karl P. Riggle, M.D. : | |
| 1110 Professional Boulevard : | |
| Suite 101 : | |
| Hagerstown, MD 21740 : | |
| : | |
| **Defendants.** : | |

## COMPLAINT

1. This case arises from injuries suffered by Amy Trout as a result of the negligence of the defendants, Dr. Karl P. Riggle and his employer Tristate Surgeons, LLC. The defendants' negligence caused permanent bilateral paralysis of Mrs. Trout's vocal cords during a total thyroidectomy performed by Dr. Riggle on October 11, 2023 at Meritus Medical Center in Hagerstown, Maryland.

**Parties and Jurisdiction**

2. This court has diversity-of-citizenship jurisdiction under 28 U.S. Code § 1332(a)(1). The plaintiffs are citizens of Maryland. Dr. Riggle and his LLC are citizens of Pennsylvania. The amount in controversy exceeds the required jurisdictional amount for the United States District Court, District of Maryland (Northern Division), which is also the proper venue for this matter.

3. Amy Trout was born on September 4, 1969. She lives at 141 West High Street, Hancock, MD 21750 with her husband, Timothy Trout.

4. Dr. Karl P. Riggle is a general surgeon who resides at 12346 Johnstons Lane, Mercersburg, PA 17326.

5. Tristate Surgeons, LLC, ("Tristate") is a Maryland limited liability corporation. Upon information and belief, Dr. Riggle is the sole member of Tristate, and it is therefore deemed to be a citizen of Pennsylvania.

6. This case presents claims against health care providers for medical injury within the meaning of Md. Code Cts. & Jud. Proc. §3-2A-01. This claim was presented to the Health Claims Alternative Dispute Resolution Office of Maryland, and the plaintiffs waived arbitration pursuant to Md. Code Cts. & Jud. Proc. § 3-2A-06B(b)(1). The order of transfer was issued on August 11, 2025.

**Claims**

7. On September 11, 2023, Mrs. Trout saw Dr. Riggle for a consultation about her thyroid gland. This was her first appointment with Dr. Riggle. Mrs. Trout told Dr. Riggle that she had nodules on her thyroid that were making it difficult for her to swallow. She had had a biopsy which determined the nodules were non-cancerous. Dr. Riggle offered to perform

a total thyroidectomy on Mrs. Trout. Despite the fact that Mrs. Trout's nodules were benign and relatively small, Dr. Riggle did not counsel her on less invasive, nonsurgical treatment options.

8. In his note from the September 11, 2023 visit, Dr. Riggle documented that he "Offered to do a total thyroidectomy. She understands that this might not fix her dysphagia symptoms." He also documented that he discussed the following risks with her: hypocalcemia, need of long-term calcium supplementation, need for chronic thyroid replacement, risk of recurrent laryngeal nerve injury, temporary and permanent, voice changes.

9. The recurrent laryngeal nerve innervates the muscles that control the opening and closing of the vocal cords, enabling speech, swallowing, and breathing. It also protects the airway from aspiration by ensuring that the vocal cords close appropriately.

10. On October 11, 2023, Dr. Riggle performed a total thyroidectomy on Mrs. Trout at Meritus Medical Center in Hagerstown, MD.

11. Dr. Riggle stated in his operative report that he "started with the left lobe…using the harmonic scalpel the parathyroids were carefully identified and dissected away from the thyroid gland…The left recurrent laryngeal nerve was not visualized though the right was…I now proceeded to the right lobe."

12. Dr. Riggle noted that Mrs. Trout "appeared to tolerate the procedure well" and that there were "no interoperative complications."

13. Dr. Riggle did not use intraoperative nerve monitoring during the procedure. Intraoperative nerve monitoring (IONM) protects the recurrent laryngeal nerves during a total thyroidectomy using electrodes that detect changes in nerve function and alert the

surgical team immediately if a nerve has been compromised. IONM is particularly important for total thyroidectomies because a surgeon can abort the second side of the surgery if there is loss of nerve signal from the first side, eliminating the risk of a bilateral nerve injury. IONM is routinely used by surgeons performing thyroidectomy because it decreases the risk of permanent bilateral nerve injury without adding any new risks to the procedure.

14. The surgical pathology report described "benign thyroid tissue with nodular goiter" and noted "two incidental parathyroid glands are present."

15. Mrs. Trout was extubated in the post-anesthesia care unit (PACU) shortly after surgery. Upon extubation, Mrs. Trout experienced respiratory distress with stridor – a high-pitched, whistling sound made during breathing that is usually caused by a narrowing or obstruction in the upper airway.

16. Approximately three hours later, Dr. Riggle ordered reintubation of Mrs. Trout to address "increased stridor." The anesthesia team reintubated Mrs. Trout "without incident."

17. Mrs. Trout was extubated two days later, on October 13, 2023. She remained in the intensive care unit (ICU) at Meritus and continued to have intermittent stridor, difficulty swallowing and a weak voice.

18. In a progress note on October 14, 2023, Dr. Riggle noted that he "cannot completely exclude laryngeal nerve injury."

19. On October 18, 2023, Angela Stonebreaker, M.D., an otolaryngologist (ENT) at Meritus, performed a flexible laryngoscopy on Mrs. Trout. In her procedure note, Dr. Stonebreaker described "bilateral vocal cords fixed [without] mobility." Dr. Stonebreaker

documented that Mrs. Trout had hoarseness, stridor, and a compromised airway due to bilateral vocal cord paralysis.

20. Mrs. Trout was discharged home from Meritus on October 20, 2023. She had several follow-up appointments with Dr. Riggle at the Tristate Surgeons office. She continued to experience difficulty breathing which made it hard for her to sleep. Her voice was hoarse and weak.

21. On February 5, 2024, Mrs. Trout obtained a second opinion from Alexander Hillel, M.D., an ENT at Johns Hopkins Otolaryngology. Dr. Hillel noted that her bilateral vocal cords had no abduction or adduction and urged Mrs. Trout to have a tracheostomy as soon as possible to secure her airway.

22. On February 9, 2024, Mrs. Trout underwent a tracheostomy at Johns Hopkins Hospital. The procedure involved creating an opening in Mrs. Trout's neck and inserting a tracheostomy tube into the opening.

23. Mrs. Trout continues to see Dr. Hillel on an outpatient basis. Dr. Hillel has informed Mrs. Trout that her vocal cord paralysis is likely permanent.

24. Mrs. Trout will need a trach for the rest of her life to enable her to breathe and speak. In addition to the routine maintenance Mrs. Trout must do, including cleaning and changing the trach tube, she will need to see a doctor multiple times a year for maintenance of her trach.

25. Mrs. Trout struggles to speak for more than short periods of time and is unable to talk while engaging in activities that increase her respiration rate, such as walking.

26. Prior to the surgery performed by Dr. Riggle, Mrs. Trout worked six to seven days a week as a manager at a Subway outlet in Hancock, MD. She tried to go back to work at

Subway after the surgery but was unable to maintain her former position because of voice limitations and decreased stamina due to her bilateral vocal cord paralysis. She now works part-time as a security guard and has suffered a significant reduction in earnings that has made it hard for her and her husband to provide for themselves.

27. Because of her trach, Mrs. Trout can no longer engage in activities she once loved to do with her husband, children and grandchildren, such as swimming or tubing on the river. Mrs. Trout has isolated herself socially because of the stigma associated with having a trach. Her voice is raspy and hoarse and easily fatigued.

28. Dr. Riggle owed a duty to Mrs. Trout to follow the standard of care for surgeons treating patients with benign thyroid nodules, including the advice given about whether to have the thyroid gland removed and the techniques used to perform total thyroidectomy if indicated and if agreed on by the patient after a thorough informed consent discussion.

29. Careful surgeons follow the standard of care in performing thyroid surgery in order to minimize the risk of serious permanent injury, the most prominent of which in this procedure being the risk of bilateral vocal cord paralysis due to nerve damage.

30. Visualization of the entire length of the recurrent laryngeal nerve on both sides is essential to safe removal of the thyroid gland to avoid permanent damage to these nerves and bilateral vocal cord paralysis. Visualization of the nerve is thus required by the standard of care to protect patient safety.

31. Dr. Riggle violated the standard of care in the following ways:

    a. Dr. Riggle failed to visualize the left recurrent laryngeal nerve at any point during surgery. Visualization of the nerves is always critical during a total

thyroidectomy, but it is especially critical where, as here, the surgeon elects not to use intraoperative nerve monitoring.

b.  Dr. Riggle completed the second side of the thyroidectomy – the right side – after failing to visualize the recurrent laryngeal nerve on the first (left) side. Because Dr. Riggle did not visualize the nerve on the first side, he could not be positive that he had protected it and should have aborted the second side of the surgery. Dr. Riggle should have prioritized preventing a bilateral nerve injury – which is serious and sometimes life-threatening – over completing the surgery.

c.  Dr. Riggle did not counsel Mrs. Trout on the risks of undergoing a total thyroidectomy without intraoperative nerve monitoring, including the increased risks of bilateral vocal cord paralysis and permanent tracheostomy. Dr. Riggle did not counsel Mrs. Trout on the availability and benefits of using nerve monitoring and the increased risks associated with doing the procedure without it.

d.  Dr. Riggle did not counsel Mrs. Trout on less invasive options than a total thyroidectomy, even though her thyroid gland was relatively small and her nodules were benign.

32. The information Dr. Riggle omitted from his pre-operative consultation with Mrs. Trout would have been important to Mrs. Trout and to any reasonable patient in her position. Had he provided this information, including the availability of intraoperative nerve monitoring, the option of going to a surgeon who routinely uses such monitoring, and the option of holding off on a total thyroid removal, a reasonable patient would have chosen not to undergo a total thyroidectomy with Dr. Riggle.  Dr. Riggle therefore violated Mrs. Trout's right to informed consent and thereby caused her serious and permanent harm.

33. The above breaches of the standard of care and violation of informed consent caused Mrs. Trout to suffer permanent bilateral vocal cord paralysis, requiring a permanent tracheostomy. She will need to see a doctor several times a year for the rest of her life to maintain her trach. She is limited in many of her daily activities which makes it impossible for her to return to her former job as a Subway manager. She suffers from the stigma associated with having a trach along with voice changes and is socially isolated as a result. The injury has harmed her relationship with her husband Timothy.

34. Tristate Surgeons, as Dr. Riggle's employer, is vicariously liable for his negligence, committed within the scope of employment, and the resulting injury to and damages suffered by the plaintiffs.

## **Damages**

35. As a result of the defendants' negligence, Mrs. Trout has suffered severe and permanent injuries. Mrs. Trout claims all damages available under the law for her injuries, including:

    e.  The personal injuries she sustained and their extent and duration;

    f.  The effect such injuries have had, and will continue to have, on her overall physical and mental health and well-being;

    g.  The physical pain and mental anguish suffered in the past and that with reasonable probability may be expected to experience in the future;

    h.  The disfigurement and embarrassment associated with that disfigurement;

    i.  The medical and other expenses reasonably incurred in the past and that with reasonable probability may be expected in the future;

    j.  The loss of earnings in the past and such earnings or reduction in earning capacity that with reasonable probability may be expected in the future.

36. Timothy Trout has suffered a loss of consortium as a result of his wife's injuries.

37. The plaintiffs demand judgment against the defendants, jointly and severally, in an amount in excess of the required jurisdictional amount for the United States District Court, District of Maryland.

38. The plaintiffs demand a trial by jury.

Respectfully submitted,

*/s/ Patrick A. Malone*
Patrick A. Malone, Esq. #8512010394
Patrick Malone & Associates, P.C.
1310 L Street, NW, Suite 800
Washington, DC 20005
Phone: (202) 742-1500
Fax: (202) 742-1515
pmalone@patrickmalonelaw.com

*Attorney for the Plaintiffs*